## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

NANCY J. LEMUS,

                **Plaintiff,**

       vs.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration;

                **Defendant.**

**CASE NO.  8:13CV226**


**MEMORANDUM
AND ORDER**

This matter is before the Court on the denial, initially and on reconsideration, of Plaintiff's disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423; supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. § 1382; and payment of attendant Medicare and Medicaid benefits.  For the following reasons, the ALJ's decision will be affirmed.

### PROCEDURAL HISTORY

Plaintiff applied for disability benefits under Titles II and XVI on November 6, 2008 (Social Security Administrative Record, Filing No. 14 ("Tr."), 159, 166), with a protected filing date of October 22, 2008.  (Tr. 199.)  Following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act for purposes of Plaintiff's Title II and Title XVI claims.  (Tr. 22.)  On May 10, 2012, the Appeals Council of the Social Security Administration denied Plaintiff's request for review.  (Tr. 4-6.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Plaintiff was born in 1971 and alleged she became disabled because of bipolar and anxiety disorders on January 1, 2006.  (Tr. 159, 166, 203.)  Plaintiff obtained her G.E.D. and has past work experience as a flagger,[1] hostess, housekeeper, and fast food worker.  (Tr. 36, 204, 260, 285.)

## I.    Documentary Evidence Submitted to the ALJ

Plaintiff underwent a Psychiatric Diagnostic Evaluation with Christine Karell ("Karell"), a nurse practitioner, in November 2006.  (Tr. 300-01.)  She reported drinking alcohol every two weeks and using methamphetamines approximately twice a month and occasionally every day.  (Tr. 300.)  Upon examination, she appeared disheveled and restless.  (Tr. 301.)  She had poor hygiene, a dysphoric mood, and paucity of speech.  (Tr. 301.)  She made normal eye contact, but evidenced delusions and hallucinations along with tangential thought processes.  (Tr. 301.)

Plaintiff saw Karell again in January 2007, reporting mood swings.  (Tr. 312.)  She admitted she only took her prescribed medications for one month.  (Tr. 312.)  Upon

---

[1] The Dictionary of Occupational Titles,  DICOT 372.667-022 (G.P.O), 1991 WL 673097, defines "flagger" as a service occupation in the construction industry wherein a person,

> Controls movement of vehicular traffic through construction projects: Discusses traffic routing plans, and type and location of control points with superior. Distributes traffic control signs and markers along site in designated pattern. Directs movement of traffic through site, using sign, hand, and flag signals. Warns construction workers when approaching vehicle fails to heed signals to prevent accident and injury to workers. Informs drivers of detour routes through construction sites. Records license number of traffic control violators for police. May give hand marker to last driver in line up of one-way traffic for FLAGGER (construction) at opposite end of site, signaling clearance for reverse flow of traffic.

examination, she appeared appropriate, neat, and clean.  (Tr. 312.)  Plaintiff had pressured speech and restless psychomotor activity.  (Tr. 312.)

Plaintiff saw Steve Rolls ("Rolls"), a physicians' assistant in November 2008, requesting a refill of Seroquel and Adderall.  (Tr. 293.)  She reported moodiness, occasional panic attacks, occasional racing thoughts, and stress about financial difficulties. (Tr. 293.)  She denied hallucinations.  (Tr. 293.)  Rolls performed a physical examination and prescribed medications.  (Tr. 293.)

In January 2009, in conjunction with her disability application, Plaintiff underwent a consultative examination with Matthew Hutt, Ph.D. ("Dr. Hutt").  (Tr. 284-91.)  She reported taking no medication at that time.  (Tr. 286.)  She stated that she drank alcohol approximately every other weekend and admitted to occasional cannabis use.  (Tr. 287.)  She reported auditory hallucinations occurring occasionally.  (Tr. 288.)  Upon examination, she spoke rapidly and seemed nervous, but appeared open and forthcoming.  (Tr. 284, 288.)  She had tangential, pressured speech at times, but could answer all questions in a reasonable, articulate manner.  (Tr. 288.)  Her social judgment appeared to be mixed to poor and her mental acuity appeared to be within normal limits. (Tr. 288- 89.)  Plaintiff reported an inability to complete normal household chores and difficulty leaving her home to perform errands.  (Tr. 289.)  Dr. Hutt opined Plaintiff had "quite impaired" social functioning, but could relate to co-workers and supervisors "for the most part."  (Tr. 289-90.)  He opined she had mild limitations in concentration and attention, but could accurately carry out a four-step instruction.  (Tr. 290.)  Dr. Hutt diagnosed Plaintiff with bipolar disorder, periodic alcohol abuse, and panic disorder with agoraphobia.  (Tr. 290.)  He assessed her with a Global Assessment of Functioning

3

("GAF") score of 52.[2]  (Tr. 290.)  Dr. Hutt completed a questionnaire in which he opined Plaintiff had restrictions in her activities of daily living, maintaining social functioning, recurrent episodes of deterioration when stressed, and an inability to adapt to changes in her environment.  (Tr. 283.)  He opined Plaintiff could understand, remember, and carry out short and simple instructions and could relate appropriately to co-workers and supervisors.  (Tr. 283.)

In January 2009, Plaintiff was referred to the Community Support Program.  (Tr. 306.)  Plaintiff saw Karell in February 2009.  (Tr. 311.)  She admitted she did not take the medication prescribed for her because she was afraid of potential side effects.  (Tr. 311.)  Upon examination, she had pressured speech and a dysphoric, hypomanic mood.  (Tr. 311.)

On February 17, 2009, Christopher Milne, Ph.D. ("Dr. Milne"), a state agency consultant, completed a mental residual functional capacity ("RFC") assessment.  (Tr. 262-65.)  He opined Plaintiff had moderate limitations in her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with

---

[2] Clinicians use the GAF scale to assess a patient's level of psychological, social, and occupational functioning.  *See Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*) 34 (4th ed. text revision 2000).  Scores of 51 to 60 indicate "moderate" symptoms such as occasional panic attacks, or moderate difficulty in occupational functioning.  *See id.*  Scores of 61 to 70 indicate "mild" symptoms, and are appropriate for a patient who is "generally functioning pretty well."  *See id.*  Scores of 71 to 80 indicates no more than slight impairment in social, occupational, or school functioning.  *See id.*

4

the general public; and her ability to respond appropriately to changes in the work setting.  (Tr. 262-63.)  He opined Plaintiff had no significant limitations in any other areas.  (Tr. 262-63.)  Lee Branham, Ph.D. ("Dr. Branham"), a state agency consultant, reviewed Dr. Milne's opinion and affirmed it in August 2009.  (Tr. 281.)

In March 2009, Plaintiff saw Steve Rolls ("Rolls"), a physician's assistant, requesting a refill of her Adderall.  (Tr. 292.)  Rolls noted no abnormal behavioral observations.  (Tr. 292.)

In April 2009, Plaintiff contacted Karell and reported suicidal thoughts.  (Tr. 310.) When Karell called to check up on her, Plaintiff denied suicidal thoughts.  (Tr. 310.) Plaintiff followed up with Karell the next day.  (Tr. 309.)  Plaintiff reported she was not taking any medications, she denied having depression, and she denied having any problems.  (Tr. 309.)  Upon examination, Plaintiff appeared disheveled with marginal hygiene and agitated psychomotor activity.  (Tr. 309.)  She avoided eye contact and appeared distracted.  (Tr. 309.)  She had rapid, loud speech; an irritable mood; and a labile affect. (Tr. 309.)  Her thought processes appeared tangential, but she was oriented. (Tr. 309.)  Karell rated her judgment as fair and her insight as poor.  (Tr. 309.)

Plaintiff returned to Karell later the same month.  (Tr. 308.)  Plaintiff reported mood swings and that she was planning to move to Denver.  (Tr. 308.)  Upon examination, Plaintiff had an appropriate appearance with normal grooming.  (Tr. 308.) She had increased psychomotor activity and fleeting eye contact, but focused and sustained attention.  (Tr. 308.)  She spoke rapidly and reported hallucinations.  (Tr. 308.)  Her mood was euthymic; she had a congruent affect; fair judgment and insight; and coherent, goal-directed thought processes.  (Tr. 308.)

5

When Plaintiff saw Rolls to refill her medications in February 2010, she reported that she had been feeling somewhat depressed, but she was "getting along fairly well" and "doing pretty good." (Tr. 368.) Rolls refilled Plaintiff's Adderall. (Tr. 368.)

In March 2010, Plaintiff returned to see Karell, and reported multiple symptoms. (Tr. 338.) Upon examination, she appeared appropriate, with normal, casual grooming. (Tr. 339.) She had increased, restless psychomotor activity with fidgeting. (Tr. 339.) She had focused and sustained attention. (Tr. 339.) She had fleeting eye contact, pressured speech, and a hypomanic mood. (Tr. 339.) She reported paranoid delusions and auditory hallucinations. (Tr. 340.) She had tangential thought processes and fair insight and judgment. (Tr. 340.) She appeared oriented and had intact memory. (Tr. 340.) Karell assessed Plaintiff with a GAF score of 70-61, which referred to "some mild [symptoms], some difficulties in functioning." (Tr. 341.) Plaintiff saw a different physician's assistant, Larry Isom, for medication refills in June 2010. He observed that she spoke rapidly, but was alert and oriented. (Tr. 382.)

Plaintiff returned to Karell in June 2010. (Tr. 343.) She reported episodic alcohol and marijuana use. (Tr. 343-44.) Upon examination, she had an appropriate, casual appearance and normal grooming. (Tr. 344.) She fidgeted, was distracted, and had an anxious, dysphoric mood. (Tr. 344.) Her eye contact was normal and her speech was rapid, but clear and fluent. (Tr. 344.) She reported paranoid delusions and auditory hallucinations. (Tr. 345.) She had good insight and judgment. (Tr. 345.) Karell assessed Plaintiff with a GAF score of 80-71, indicating that her symptoms were transient and she had only a slight impairment. (Tr. 346.)

6

When Karell saw Plaintiff in July 2010, she noted that Plaintiff had an appropriate, casual appearance with normal grooming. (Tr. 348.) She exhibited increased psychomotor activity and fidgeted. (Tr. 348.) She made fleeting eye contact and appeared distracted. (Tr. 348.) Plaintiff's mood was euthymic and she had a congruent affect. (Tr. 348.) She reported auditory hallucinations and paranoid delusions. (Tr. 348-49.) Karell rated Plaintiff's judgment and insight as good and found her to be fully oriented. (Tr. 349.) She assessed Plaintiff with a GAF score of 80-71. (Tr. 350.)

The next month, Plaintiff told Karell that she was looking for a job and she experienced less paranoia. (Tr. 351.) Upon examination, she had an appropriate, casual appearance, made normal eye contact, and had an euthymic mood with congruent affect. (Tr. 352.) She continued to report paranoid delusions and auditory hallucinations. (Tr. 352.) She fidgeted and was distracted. (Tr. 352.) Karell again found Plaintiff's insight and judgment to be good and noted that she was fully oriented. (Tr. 353.) Karell assessed her with a GAF score of 80-71. (Tr. 354.)

In September 2010, Plaintiff reported that her mood was "ok" and her symptoms were stable. (Tr. 355.) Upon examination, Plaintiff appeared disheveled and distracted, but she had an appropriate, casual appearance. (Tr. 356.) She had increased psychomotor activity. (Tr. 356.) She had rapid speech, but it was clear and fluent. (Tr. 356.) She reported auditory hallucinations and her thought processes appeared tangential. (Tr. 356.) Karell rated Plaintiff's insight and judgment as fair, but kept Plaintiff's GAF score the same. (Tr. 357-58.)

7

Plaintiff started seeing Barbara Shannon ("Shannon"), a licensed professional counselor, the same month upon a referral from Karell.  (Tr. 407-16.)  Plaintiff's primary reason for seeing Shannon's was to help with smoking cessation.  (Tr. 407.)  She admitted she continued to use marijuana.  (Tr. 409.)  Upon examination, Plaintiff had a normal appearance and normal posture, speech, attitude, perception, cognitive function, and thought content.  (Tr. 413-14.)  She was slightly restless, and her mood was slightly anxious and depressed.  (Tr. 413.)  Her affect was slightly angry, depressed, anxious, and irritable.  (Tr. 413-14.)  She had a slight impairment in judgment.  (Tr. 414.)  She could hold a normal conversation, made good eye contact, and was oriented.  (Tr. 414.)  Shannon assessed Plaintiff with a GAF score of 55 and opined that her prognosis was moderate.  (Tr. 415.)

In October 2010, Plaintiff's examination revealed an appropriate, casual appearance with normal grooming.  (Tr. 360.)  She demonstrated increased motor activity, but her attention was focused and sustained and she made normal eye contact.  (Tr. 360.)  Plaintiff had clear, fluent speech, her mood was euthymic, and she had a congruent affect.   (Tr. 360.)   She reported paranoid delusions and auditory hallucinations.  (Tr. 360-61.)  She had coherent/goal directed thought processes, and good insight and judgment.  (Tr. 361.)  Karell continued to assess Plaintiff with a GAF score of 80-71.  (Tr. 362.)

In November 2010, Plaintiff saw Terri Myers, M.D. ("Dr. Myers").  (Tr. 387-89.)  Plaintiff reported normal energy levels and denied fatigue, sleep problems, depression, and anxiety.  (Tr. 387.)  Upon examination, Dr. Myers found Plaintiff to be pleasant, alert, and oriented.  (Tr. 388.)

8

In February 2011, Shannon completed a medical source statement.  (Tr. 314-16.)

She opined Plaintiff had marked to extreme limitations in almost every area.  (Tr. 314-

15.)  Karell also completed a medical source statement in March 2011.  (Tr. 335-37.)  In

it, she opined Plaintiff had moderate to extreme limitation in almost every area.  (Tr.

335-36.)

Plaintiff underwent a neuropsychological examination with Anne Talbot, Psy.D.

("Dr. Talbot"), in April and May 2011.  (Tr. 394-405.)  Upon examination, Dr. Talbot

noted Plaintiff's hygiene and grooming were fair, but her speech was somewhat

pressured at times.  (Tr. 397.)  Plaintiff appeared to put forth a solid effort and she was

cooperative.  (Tr. 397.)  Testing indicated questionable validity of Plaintiff's performance

at the assessment.  (Tr. 397.)  Intelligence testing showed results in the borderline to

average range, but significant discrepancies in her scores suggested that the test may

not have been an accurate indicator of her actual functioning.  (Tr. 399, 403.)  Her

reading and writing skills were in the low range and her mathematics skills were within

the low average range.  (Tr. 399-400.)  Neurocognitive testing revealed that she had

mild impairment in her visual memory, but "at least functional" attention to visual detail.

(Tr. 400.)   She had moderate impairment in sustained attention tasks and was

distractible, but she had average ability to perform tasks requiring more complex

attention and mental flexibility, which Dr. Talbot considered to be within functional limits.

(Tr. 400.)   Dr. Talbot found Plaintiff's problem-solving to be mildly impaired to low

average.  (Tr. 400.)   Testing revealed Plaintiff's memory to be mildly to moderately

impaired, but generally within functional limits.  (Tr. 400-01.)

Dr. Talbot diagnosed Plaintiff with a mild cognitive impairment, bipolar disorder, generalized anxiety disorder, and obsessive compulsive traits.  (Tr. 402.)  She opined Plaintiff had a mildly impaired ability to maintain attention and concentration for extended periods, but her general attention and concentration, and working memory were in a low average range.  (Tr. 403.)  Dr. Talbot found that Plaintiff had average general cognitive processing speed and flexibility, which were within normal functioning limits.  (Tr. 403.)  Dr. Talbot found Plaintiff to have mild impairment in many areas, including her abilities to: remember locations and work-like procedures; understand and remember detailed instructions; perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; manage her own schedule; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 404.)  She opined Plaintiff had mild to moderate impairment in carrying out detailed instructions and asking simple questions or requesting assistance from a supervisor.  (Tr. 404.)  Dr. Talbot found Plaintiff to be functioning within normal limits in her abilities to interact with the general public; maintain socially appropriate behavior; adhere to basic standards of behavior; work in coordination with or in proximity to others without being too distractible; and understand and remember very short and simple instructions.  (Tr. 404-05.)

Shannon wrote a narrative letter for Plaintiff on May 10, 2011.  (Tr. 406.) She opined that Plaintiff's symptoms would make it "extremely difficult" for Plaintiff to successfully obtain and keep employment.  (Tr. 406.)

## II.   Evidence Presented at the Hearing

At a hearing on May 17, 2011 (Tr. 29-53), Plaintiff testified she had difficulty concentrating and focusing on tasks, but did not have problems completing her daily tasks around the house.   (Tr. 38, 41-42.)   She said she primarily had problems remembering dates and appointments.   (Tr. 42-43.)   She said she "shut down" when she got anxious or depressed and she had difficulty showing up to work.   (Tr. 38-39.) She testified that she attended counseling with her daughter.   (Tr. 42-44.)   She testified that she spent most of her day cleaning house.   (Tr. 48.)   She reported she had been clean from drugs for fourteen years and that she only drank alcohol socially once or twice a month.   (Tr. 36-37.)

At the hearing, Thomas Atkin, Psy.D. ("Dr. Atkin"), a clinical psychologist, testified as a medical expert.   (Tr. 30, 32.)   He testified that Plaintiff carried diagnoses of bipolar disorder, anxiety disorder, and polysubstance abuse.   (Tr. 33.)   He testified the medical records did not indicate Plaintiff's polysubstance abuse was in remission.   (Tr. 33.)   He opined that Plaintiff had mild limitations in activities of daily living and moderate limitations in maintaining social functioning and in maintaining concentration, persistence or pace.   (Tr. 33, 327.)

Before the hearing, Dr. Atkin completed a medical source statement in which he opined Plaintiff had moderate limitations in her ability to understand, remember, carry out, and make judgments on complex instructions and complex work-related decisions. (Tr. 317-34.)   He further opined Plaintiff had moderate limitations in her ability to interact with the public, interact appropriately with supervisors, and respond appropriately to usual work situations and to changes in a routine work setting.   (Tr. 333.)   He found

11

Plaintiff to have mild to no limitations in all other areas.  (Tr. 331-33.)  In the medical source statement, Dr. Atkin opined that Plaintiff's limitations would be expected to improve with sustained sobriety and treatment follow-through.  (Tr. 333.)

At the hearing, Dr. Atkin explained the consultative examination indicated Plaintiff had sufficient concentration for simple, repetitive work.  (Tr. 34.)  He also opined that the treatment records did not support the extreme limitations suggested by Shannon and Karell.  (Tr. 34, 314-16, 335-37.)  He opined that the neuropsychological evaluation completed by Dr. Talbot (Tr. 394-405) supported his opinion that Plaintiff had only moderate limitations.  (Tr. 34.)  He opined Plaintiff had functioned at the moderate level since 2006.  (Tr. 35.)  Dr. Atkin testified that he excluded the effects of drug and alcohol use from his opinion and testified that her limitations could be expected to be greater at times when she was under the influence of drugs or alcohol.  (Tr. 34.)

At the hearing Plaintiff testified that she worked in the past as a flagger, hostess, housekeeper, and a fast-food worker.  (Tr. 46-47.)  Plaintiff testified that her work as a flagger lasted about three-months and it was a full time position.  (Tr. 47.)

At the hearing, Bill Tysdal ("Tysdal") testified as a vocational expert ("VE").  (Tr. 48.)  The ALJ limited the VE's consideration to Plaintiff's job as a flagger, and presented an RFC assessment in the form of a hypothetical:

> [ALJ]  The only one we will use is the flagger.... I want you to assume: younger individual with a GED, this work history, the only full-time job being the flagger, although it is just under the wire in terms of length, but long enough to know how to do it, who is limited to simple, repetitive work and is moderately limited in the four ... social domains but can function satisfactorily. And you're familiar with those domains, are you not, on the medical source statement?
>
> [Tysdal]  I am, yes.

12

> [ALJ]  Can you identify any jobs that person could do?
>
> [Tysdal]  Well, I think the flagger is a pretty low-level, simple, repetitive job. It does involve some public contact; however, with the moderate, you know, satisfactory limitation, I think that that would be within the limits.

(Tr. 49-50.)

At the end of the hearing, Plaintiff's attorney, Tyler Petitt ("Pettit"), noted that Dr. Atkin testified that there were no treatment notes from Karell and Shannon to "back up their opinions."  (Tr. 53.)  Petitt asked that the record be kept open for "a week or so" allowing Petitt time to look for additional material to supplement the record.  (Tr. 52.)

## III.   The ALJ's decision

The ALJ issued his decision nine days after hearing.[3]  (Tr. 12.)  The ALJ's decision followed the five-step sequential evaluation, found in 20 C.F.R. §§ 404.1520(4), 1520a, applicable to cases involving a mental impairment.  (Tr. 13-23.)  At Step One, the ALJ found no substantial gainful activity ("SGA") after January 1, 2006, the alleged onset date of Plaintiff's disability.  (Tr. 15.)  At Step Two, the ALJ identified the following severe impairments: bipolar disorder, anxiety disorder with panics, and polysubstance abuse.  (Tr. 15.)  At Step Three, the ALJ determined that none of Plaintiff's impairments or a combination of Plaintiff's impairments met or equaled a Listing impairment.  (Tr. 15-16.)  At Step Four, the ALJ formulated Plaintiff's RFC and found that Plaintiff had nonexertional limitations, as follows:

> [L]imited to simple, repetitive work, with moderate limitations (i.e., there is more than a slight limitation in this area, but the claimant is still able to function satisfactorily) in an ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex

---

[3] The treatment records were not submitted prior to the decision.  (Pl. Br., Filing No. 19 at 13.)

13

work-related decisions, interact appropriately with the public, interact appropriately with supervisors, and respond appropriately to usual work situations and to changes in a routine work setting.

(Tr. 17.)  The ALJ concluded at Step Four.

With regard to Plaintiff's credibility, the ALJ found that "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the above [RFC] assessment."  (Tr. 17.)   With regard to opinion evidence, the ALJ assigned "very little weight" to Karell's and Shannon's assessments and "greater weight" to the opinions of "numerous clinical psychologists."  (Tr. 21.)

At Step Four, the ALJ found Plaintiff "capable of performing past relevant work as a flagger" and concluded that she was not disabled.  (Tr. 22.)

## IV.   Evidence Submitted to the Appeals Council

After receiving the ALJ's decision, Plaintiff submitted additional treatment records from Shannon to the Appeals Council.  (Tr. 432-60.)   Generally, these treatment records, dated October 2010 through July 2011, documented parenting and relationship problems and included family sessions.  (Tr. 434-60.)   The examinations most often revealed that Plaintiff had a labile mood and appeared distracted, depressed, anxious, and fidgety.  (Tr. 434-60.)

Plaintiff also submitted a response to the ALJ's decision from Dr. Talbot.  (Tr. 462-70.)   In a narrative letter, Dr. Talbot argued the ALJ misinterpreted her report by referring to summary statements instead of the entire report.  (Tr. 463-67.)   She also stated that the term "mild" meant two standard deviations from the norm; "moderate"

14

was more limiting; and that "severe" was at least three to four standard deviations from the norm. (Tr. 465.) Dr. Talbot also criticized the use of GAF scores, and the examination findings of physical doctors. (Tr. 465.) Dr. Talbot opined Plaintiff had marked limitations in her social and occupational functioning as a result of her mental illness and cognitive functioning. (Tr. 466.) She opined Plaintiff had marked limitations in every area except for understanding, remembering, and carrying out simple instructions. (Tr. 468-69.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

The Court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel,* 226 F.3d 969, 971 (8th Cir. 2000). The Court does not

15

owe deference to the Commissioner's legal conclusions.   *See Brueggemann v. Barnhart,* 348 F.3d 689, 692 (8th Cir. 2003).

## DISCUSSION

In a DIB case, the burden is on the claimant to prove that he or she has a disability.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The Commissioner has promulgated regulations outlining a five-step sequential evaluation to guide an ALJ in determining whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4).   The claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

In this case, the ALJ concluded that Plaintiff is not disabled under 216(i), 223(d), and 1614(a)(3)(A) of the Act.   (Tr. 22.)   Plaintiff asserts several errors in the ALJ's decision, which are addressed below.

## I.    Plaintiff's Substance Abuse

Plaintiff argues that the ALJ erred in failing to follow the drug addiction and alcoholism procedure set out in *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir. 2003). Defendant claims the ALJ properly considered the effects of Plaintiff's substance abuse.

16

When substance abuse is a concern, the ALJ must initially determine whether the claimant is disabled "using the standard five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders." *Brueggeman*, 348 F.3d at 694. Then, if the ALJ finds that a claimant is disabled and there is medical evidence of the claimant's drug addiction or alcoholism, the ALJ must determine whether the claimant's drug or alcoholism is a "contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a); *Brueggemann*, 348 F.3d at 693. The ALJ makes this determination by following the procedures set out in 20 C.F.R. § 404.1535. *Brueggemann*, 348 F.3d at 694. "[I]f alcohol or drug abuse comprises a contributing factor material to the determination of disability, the claimant's application must be denied." *Id.* at 693 (citing 42 U.S.C. § 423(d)(2)(C); 20 C.F.R § 404.1535).

Here, the ALJ applied the standard five-step evaluation and determined that the claimant was not disabled. Despite evidence of Plaintiff's substance abuse, the ALJ did not apply the expanded analysis set out in *Brueggemann* and 20 C.F.R. § 404.1535 because he initially determined that Plaintiff was not disabled.

Plaintiff argues that the ALJ's decision reflects legal error because the ALJ's disability determination improperly excluded the assumed effects of any substance use disorder. Plaintiff's argument centers around Dr. Atkin's testimony at the hearing. At the hearing, Dr. Atkin testified that he excluded the effects of drug and alcohol use from his opinion, and he opined that Plaintiff's limitations would be greater when she was under the influence. In determining Plaintiff's RFC, the ALJ "accord[ed] Dr. Atkin's opinions with substantial weight." (Tr. 21.)

17

Defendant claims that the weight the ALJ assigned to Dr. Atkin's opinions was proper because the evidence indicates that Dr. Atkin erred when he stated that he excluded the effects of substance use from his opinions.  Defendant directs the Court to evidence in the record that supports this conclusion.  The fifth question on the medical source statement completed by Dr. Atkin asked if any alcohol or substance abuse contributed to the limitations opined and, if so, asked him to explain what changes he would make to his opinion if Plaintiff was totally abstinent from alcohol and/or substance use.  (Tr. 333.)  Dr. Atkin responded to the question by stating that Plaintiff's limitations would be expected to improve with sustained sobriety and treatment follow through. (Tr. 333.)  This response indicates that Dr. Atkin's *included* the effects of drug and alcoholism in the opinions he provided.  Further, Dr. Atkin reviewed Dr. Talbot's report which did not exclude the effects of drug or alcohol use.  Dr. Atkin reviewed this report and testified that it supported his opinion of only moderate limitations.  Likewise, the treatment records and GAF scores assessed by Karell and Shannon did not exclude the effects of substance use and those scores supported a finding of only moderate limitations.

The Court also notes that this case is distinguishable from *Brueggemann*, where the Eighth Circuit stated that the ALJ's "legal conclusion to exclude essential evidence left the remainder of the ALJ's five-step evaluation as a decision without the necessary factual foundation and constitutes legal error."  348 F.3d at 693.  In *Brueggemann* the ALJ expressly excluded evidence of disability presented by the claimant's treating specialist from the hypothetical posed to the vocational expert on the basis that the evidence included the effects of alcohol use.  *Id.* at 689.  Here, the ALJ did not

expressly exclude such evidence.  To the contrary, the ALJ considered evidence that included the effects of Plaintiff's substance use.

Accordingly, Substantial evidence in the record supports a reasonable conclusion that Dr. Atkin's opinions and the ALJ's disability determination included the effects of substance use.  The ALJ was not required to apply the expanded analysis because the materiality of drug addiction and alcoholism only needs to be considered upon initial finding of a disability.

## II.   Identification of Severe Impairments

At Step Two the ALJ assessed three severe impairments: bipolar disorder, anxiety disorder with panics, and polysubstance abuse.  Plaintiff claims that the ALJ should have identified a severe cognitive impairment, and that failure to do so is grounds for reversal.  At Step Two, the ALJ determines whether the claimant has a "severe" impairment, 20 C.F.R. § 404.1520(a)(4)(ii), that is, an impairment or combination of impairments that significantly limits physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1521(a).  Significant is defined as "more than slight or minimal."  *Cook v. Bowen,* 797 F.2d 687, 690 (8th Cir.1986).

Dr. Talbot, the only provider who diagnosed a cognitive impairment, opined that Plaintiff's cognitive impairment was mild.[4]  (Tr. 20, 402.)   Dr. Talbot found Plaintiff's

---

[4] Plaintiff argues that the ALJ misinterpreted Dr. Talbot's report, claiming the term, "mild" really meant, "marked."  In a rebuttal letter submitted on appeal, Dr. Talbot stated that "mild" in neuropsychological testing meant two standard deviations below the norm.  (Tr. 465.)  Dr. Talbot's letter was not before the ALJ because Plaintiff obtained it after the ALJ issued the unfavorable decision.  (Tr. 462.)  Additionally, Shannon stated she asked Dr. Talbot to write her report in "layman terms," which suggests that was what Dr. Talbot did.  (Tr. 406.)  Moreover, Dr. Atkin, a licensed psychologist, reviewed the evidence and specifically stated that Dr. Talbot's examination findings showed only moderate limitations.  (Tr. 34.)  Finally, even if Dr. Talbot's use of the term "mild" meant "marked" limitations, the ALJ's decision is still supported by

general cognitive processing speed and mental flexibility to be average and within normal functioning limits. (Tr. 403.) Other providers did not note any cognitive problems. Dr. Hutt found that Plaintiff's mental acuity appeared to be within normal limits. (Tr. 288-89.) Karell found Plaintiff to have "coherent, goal-directed thought processes" on multiple occasions. (Tr. 308, 361.) Shannon found Plaintiff's cognitive function to be normal on examination. (Tr. 414.) Based on the evidence in the record when the ALJ made his decision, it was reasonable for the ALJ to conclude that Plaintiff's cognitive impairment was not severe. Moreover, the ALJ properly considered Plaintiff's non-severe impairments when determining her RFC. In his RFC explanation, he specifically discussed Dr. Talbot's records, including her diagnosis of mild cognitive impairment, and he included limitations in the RFC for the cognitive impairment. Consequently, he found Plaintiff could only perform simple repetitive work, and that she had moderate limitations in understanding, remembering, and carrying out complex instructions and in making judgments on complex work-related decisions.

## III.   Weight Assigned to Expert Opinions

Plaintiff argues that the ALJ failed to assign weight to expert opinion in accordance with substantial evidence and legal standards. Defendant argues that the ALJ properly weighed the medical opinions and thoroughly considered all of the opinions in the record providing good reason for his evaluations of the opinions.

When analyzing a DIB claim, the ALJ must consider all relevant evidence, including medical records and medical opinions. *See* 20 C.F.R. §§ 404.1513, 404.1520, 404.1520b, 404.1527. "Generally, 'a treating physician's opinion is given controlling

---

substantial evidence because Dr. Talbot admitted that Plaintiff failed two cognitive-based validity triggers raising questions regarding the validity of her test results. (Tr. 397, 403.)

weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir. 2011)) (internal marks omitted); *see also* 20 C.F.R. § 404.1527(c)(2).  If a treating provider's opinion is afforded controlling weight, the ALJ is required to defer to the physician's medical opinions with respect to the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairments, and the resulting restrictions.  20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart,* 392 F.3d 988, 995 (8th Cir. 2005).  An opinion that an applicant is "disabled" or "unable to work" is an issue that is reserved for the Commissioner and is not a "medical opinion" that must be given controlling weight. *Ellis,* 392 F.3d at 994.

"A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Renstrom*, 680 F.3d at 1064 (quoting *Perkins,* 648 F.3d at 897) (internal marks omitted).  "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (internal quotation marks and citation omitted).  The ALJ must "always give good reasons" to explain the weight given to a treating physician's evaluation.  20 C.F.R. § 404.1527(c)(2); *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).  The ALJ must apply certain factors to determine what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source.  *See* 20 C.F.R. § 404.1527(c)(2).

Plaintiff argues that the ALJ should have given more weight to the opinions of Plaintiff's nurse practitioner, Karell, and Plaintiff's mental health therapist/substance abuse counselor, Shannon.  In his decision, the ALJ explained that Karell and Shannon were not acceptable medical sources as defined by 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2);[5] however, he did consider them as "other sources" who provided evidence to show the severity and effect of Plaintiff's impairment(s).[6]  (Tr. 21.)  The ALJ further explained that he gave these opinions little weight because, although "they opined [that] the clamant had numerous 'marked' . . . and 'extreme' . . . limitations in functioning, treatment notes [did] not support such severity."  (Tr. 21.)  The ALJ also noted that the opinions were "in direct contrast with earlier opinions," namely that Karell reported "claimant's functioning throughout 2010 as primarily that with a GAF range of 71-80," Karell opined transient symptoms with slight impairment, and Shannon reported only moderate symptoms.[7]  (Tr. 21.)

_____

[5] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), § 416.927(a)(2).

[6] "In addition to evidence from the acceptable medical sources . . . we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to . . . Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists) . . . ."  20 C.F.R. §§ 404.1513(d), 416.913(d).

[7] Plaintiff argues that the ALJ improperly relied on GAF scores because GAF scores "are often no more than subjective guesses, are inconsistently used and applied, and . . . may not refer to a normative population as much as they are an estimate of a specific individual's function at a certain point in time."  (Pl. Br. Filing No. 19 at 26.) (citing Dr. Talbot at Tr. 465.)

Defendant argues that the ALJ's findings were consistent with the opinion of Dr. Atkin, the medical expert and that the ALJ properly afforded Dr. Atkin's opinions greater weight.  The ALJ explained he gave significant weight to Dr. Atkin's opinion because Dr. Atkin had a thorough understanding of the disability program and its evidentiary requirements.  The ALJ also explained that Dr. Atkin was familiar with the information in Plaintiff's record, considered all of the pertinent evidence, and provided explanations for his opinions at the hearing.

The ALJ adequately explained his reasoning with regard to weight afforded to Karell, Shannon, and Dr. Atkin's opinions.  Further, substantial evidence in the record supports the ALJ's conclusions. Thus, the Court finds that the ALJ did not commit reversible error in weighing the medical opinions in this case.

IV.     **Credibility Assessment of Plaintiff**

Plaintiff argues that the ALJ's credibility assessment was not supported by substantial evidence, legal standards, and sound reasoning.  The ALJ gave numerous reasons for discounting Plaintiff's testimony.   Plaintiff finds fault with each reason provided.  However, the Court finds that substantial evidence in the record supports the ALJ's credibility determination.

When evaluating a claim of disability, an ALJ must consider the claimant's allegations and "must make an express credibility finding and give his reasons for

---

Plaintiff also notes that the DSM-5 did away with the GAF.  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders,* Fifth Edition. Arlington, VA, American Psychiatric Association, 2013. However, GAF scores may be used by an ALJ when assessing a claimant's functioning.  *See e.g.*, *Halverson*, 600 F.3d at 930-31; *Goff v. Barnhart*, 421 F.3d 785, 789, 791, 793 (8th Cir. 2005).

discrediting the testimony." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir. 1996) (quoting *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir. 1995)) (internal quotation marks omitted). The claimant's work history and "the absence of objective medical evidence to support the claimant's complaints" are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). When evaluating symptoms, the SSA considers "medical opinions of . . . treating sources and other medical opinions . . . ." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

In this case, Plaintiff reported difficulties with concentration and focus, remembering dates, and reported "shutting down" when she became overly anxious or depressed. (Tr. 38, 39, 41-43.) She also reported that she had "problems with showing up for work because of depression or anxiety." (Tr. 39.)

The ALJ concluded that Plaintiff's allegations conflicted with many of the medical opinions. (Tr. 18-21.) The opinions of Dr. Atkin, Dr. Milne, and Dr. Talbot all indicated only mild to moderate limitations in understanding, remembering, and carrying out complex instructions, and in dealing with changes. The GAF scores of Karell, Shannon, and Dr. Hutt also indicate only mild to moderate problems in these areas. Thus, substantial medical evidence in the record supports the ALJ's determination that the medical evidence does not support Plaintiff's claimed limitations.

The ALJ considered Plaintiff's work history in evaluating her credibility. Sporadic work history combined with low earnings and years with no reported earnings may support an ALJ's finding that a claimant is not credible. *Frederickson*, 359 F.3d at 976.

24

Here, the ALJ found that Plaintiff's work history suggested that she was not "well-motivated" to work.  (Tr. 17.)   Before 2006, Plaintiff worked only five years of the prior fifteen.   (Tr. 187.)   During that time period, her highest yearly earnings totaled $5,259.41.  (Tr. 187.)   Plaintiff's sporadic work history combined with her low earning supports the ALJ's credibility finding.

The ALJ also found that Plaintiff's continued work activity conflicted with her allegations of disabling limitations.  (Tr. 17-18.)  An ALJ may properly consider that a claimant's work activity and a claimant's job search may undermine claimant's allegation that she is unable to work.  *See Tindell v. Barnhart*, 444 F.3d 1002, 1006 (8th Cir. 2006).  In this case, the ALJ found Plaintiff's ability to work part-time during her alleged period of disability was inconsistent with her claim that her depression was so bad she could not "do anything."  (Tr. 17, 203).

The ALJ also discounted Plaintiff's claims regarding her limitations because she only received sporadic treatment.  (Tr. 17-19.)   The ALJ did not consider Plaintiff credible because she did not follow treatment plans, and her noncompliance suggested that her symptoms were not as severe as she claimed.  (Tr. 18-19.)   The ALJ may discount disability claimant's subjective complaints based on the claimant's failure to pursue regular treatment.  *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). Further, "impairments that are controllable by medication do not support a finding of total disability."  *Collins ex. rel. Williams v. Barnhart*, 335 F.3d 726, 729-30 (8th Cir. 2003).   Here Plaintiff claimed she became disabled in January 2006.   The record showed no mental health treatment until November 2006, and then a gap in treatment between January 2007 and November 2008.   Plaintiff admitted she was not taking

25

prescribed medications and claimed she was afraid of side effects.  However, the record does not contain reports of significant side effects.  The Plaintiff admitted doing "fairly well" and "pretty good" when she was taking her medications.  (Tr. 19, 368.)  The ALJ also pointed out that most of Plaintiff's treatment coincided with her application for disability benefits, which the ALJ found suggested that Plaintiff sought treatment in order to bolster her disability case rather than a need to treat symptoms.  (Tr. 18.)

Finally, the ALJ considered Plaintiff's description of her daily activities as well as Plaintiff's sister's description.  The ALJ found that these descriptions were outweighed by the objective medical evidence.  (Tr. 17.)  An ALJ may consider objective medical evidence when evaluating symptoms.  *See Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

In sum, despite Plaintiff's claimed limitations, the ALJ properly analyzed the evidence in concluding that Plaintiff's allegations regarding the "limiting effects of her symptoms were inconsistent with some of the medical evidence of record."  *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010).  While Plaintiff also presented evidence consistent with her claimed debilitating symptoms, the court cannot conclude that the ALJ's credibility determination is unsupported by the record as a whole. *See id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments).  The ALJ provided good reasons for discounting Plaintiff's credibility, and those reasons are supported by substantial evidence in the record.  Accordingly, the Court will adopt the ALJ's credibility determinations.

26

V.      **Formulation of Plaintiff's RFC**

Plaintiff argues that the ALJ did not adequately formulate Plaintiff's RFC. Defendant claims the ALJ thoroughly considered all of the opinions in the record and provided good reason for his evaluations of the opinions.

An RFC assessment represents the most that a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a); *see also Leckenby v. Astrue*, 487 F.3d 626, 631 n.5 (8th Cir. 2007).  The burden of persuasion to prove disability and demonstrate RFC is on the claimant.  *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008).  "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)

At Step Two, the ALJ found that Plaintiff had severe impairments of bipolar disorder, anxiety disorder with panics, and polysubstance abuse.  The ALJ found that Plaintiff had no exertional limitations and that she could perform simple, repetitive work. (Tr. 17.)   The ALJ found that Plaintiff had moderate limitations in her ability to understand, remember, and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public; interact appropriately with supervisors and respond appropriately to usual work situations and to changes in a routine work setting.  (Tr.17.)  The ALJ defined "moderate" as more than a slight limitation, but such that Plaintiff could still function satisfactorily.  (Tr. 17.)

Plaintiff claims the ALJ failed to consider all of the evidence when making his RFC findings.  However, an ALJ is not required to discuss every piece of evidence in his opinion.  *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).  The ALJ explicitly

27

stated that he considered all the evidence in this case and a court should presume an ALJ properly discharged his duties unless there is clear evidence to the contrary.[8]   (Tr. 13, 15, 17).   *See Wilburn v. Astrue*, 626 F.3d 999, 1003-04.  (8th Cir. 2010).

The ALJ's RFC findings were consistent with substantial evidence in the record. The RFC findings were consistent with the medical expert, Dr. Atkin's, opinions.  The RFC findings are also consistent with the opinions of the state agency physicians, Dr. Milne, Dr. Branham, and the examination report of Dr. Talbot.

## VI.   Past Relevant Work

At Step Four, an ALJ compares his or her assessment of the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 404.1560(b).  "Past relevant work is work that the [claimant has] done within the past 15 years, that was [SGA], and that lasted long enough for [the claimant] to learn to do it." *Id.* at (b)(1).

Here, the ALJ found that Plaintiff was capable of performing her past relevant work as a flagger.  (Tr. at 23.)  Plaintiff does not dispute that her job as a flagger was done within the past 15 years nor does she dispute that it lasted long enough for her to learn to do the job.  Plaintiff argues that the ALJ erred in concluding that Plaintiff's work as a flagger was SGA.  Plaintiff claims that her work as a flagger was an unsuccessful work attempt ("UWA"), and therefore not SGA.

"The UWA concept was designed as an equitable means of disregarding relatively brief work attempts that do not demonstrate sustained SGA."  *Titles II & Xvi:*

_____

[8] Plaintiff argues that the ALJ should have reviewed Shannon's treatment records, which were submitted to the Appeals Council after the ALJ's decision; however, the Court agrees with the Defendant that these records were cumulative of evidence already in the record.

*Determination of Substantial Gainful Activity If Substantial Work Activity Is Discontinued or Reduced-Unsuccessful Work Attempt*, 1983-1991 Soc. Sec. Rep. Serv. 266 (S.S.A. 1984).  "If a work attempt was 'unsuccessful,' a finding of disability during the time that such work was performed would not be precluded."  *Id.*  Ordinarily, work done that lasts for a period of 6 months or less will not show that a claimant is able to do substantial gainful activity if the claimant was forced by her impairment to stop working.  20 C.F.R. § 416.974(c)(1).

Plaintiff's argument is weakened by the fact that she worked as a flagger in September of 2003, several years before the alleged onset date of her disability in 2006.[9]  Even if work outside the alleged disability period could be considered UWA, reversal is not warranted.  Plaintiff bears the burden to prove disability at Step Four, *see Steed*, 524 F.3d  at 876, and Plaintiff acknowledges the lack of evidence in the record proving her work as a flagger was UWA.  Nonetheless, Plantiff claims the ALJ had a duty to further develop the record in order to determine whether Plaintiff's work as a flagger was UWA.  The ALJ did not ask Plaintiff about the circumstances of her work, or about special conditions that made it possible for her to work as a flagger, or why the job ended.  "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  However, "reversal due to

---

[9] Defendant argues that the concept of UWA only applies to Step One and does not render past work irrelevant.  Plaintiff cites several cases discussing UWA at Step Four; however, these cases  are distinguishable from this case because they address the concept of UWA with regard to claimants' past work done *within* the alleged disability period.  *See Morales v. Apfel*, 225 F.3d 310, 319 (3rd Cir. 2000); *Seay v. Colvin,* 12-CV-14410, 2013 WL 5785782 (E.D. Mich. Oct. 28, 2013).

failure to develop the record is only warranted where such failure is unfair or prejudicial" *Id.* at 839 (internal quotation marks and citations omitted).

Plaintiff reported that she worked as a flagger from June to September 2003. (Tr. 204, 247.)  At the hearing, the Plaintiff testified that she worked full time as a flagger for "about a three-month job period."  (Tr. 47.)  Plaintiff submitted an affidavit for the purpose of showing the harm that resulted from the ALJ's failure to develop the record. Although she identified circumstances that made the job easier for her, *e.g.* working close to home, she indicated that she quit working as a flagger because the project ended.[10]  (Pl. Affidavit, Filing No. 19-1 at ECF 2.)  Plaintiff's affidavit does not show that she stopped working "because of [her] impairment or because of the removal of special conditions which took into account [her] impairment and permitted [her] to work."  *See* 20 C.F.R. § 404.1574(3) ("We will consider work of 3 months or less to be an unsuccessful work attempt if you stopped working . . . because of your impairment or because of the removal of special conditions which took into account your impairment and permitted you to work.").  Thus, Plaintiff did not prove that the ALJ's failure to develop the record was unfair or prejudicial.

## VII.   Evidence of Plaintiff's Disability

Plaintiff argues that overwhelming evidence supports a finding that Plaintiff is disabled.  Plaintiff claims that Dr. Talbot, Dr. Hutt, Dr. Atkin, Karell, and Shannon, each rated Plaintiff's mental impairments as meeting "B" criteria, SSR 85-15 criteria, or both. Plaintiff's argument is primarily centered around her claim that all of Dr. Atkin's opinions

_____

[10] Seasonal work during the relevant period is relevant when it is done at the SGA level if the claimant did it long enough to learn it.  SSA POMS DI 25005.015(F); *see Shontos v. Barnhart,* 328 F.3d 418, 424 (8th Cir. 2003) (The ALJ should consider the POMS guidelines.).

excluded the effects of substance use.  The Court has already addressed this issue and concluded that the ALJ's conclusions are supported by substantial evidence in the record.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence in the record as a whole and should be affirmed.  Accordingly,

IT IS ORDERED:

1.     The Commissioner's decision is affirmed;

2.     The appeal is denied; and

3.     Judgment in favor of Defendant will be entered in a separate document.

Dated this 7th day of July, 2014.

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge

31